Hearing Date:  June 5, 2015 at 10:00 a.m.
Objections Due:  May 18, 2015

**QUINN EMANUEL URQUHART & SULLIVAN LLP**
51 Madison Avenue, 22nd Floor
New York, New York  10010
(212) 849-7000

*Attorneys for Plaintiffs Solus Alternative Asset*
*Management LP, Ultra Master Ltd, SOLA Ltd,*
*Solus Opportunities Fund 1 LP, Solus Opportunities Fund 2 LP,*
*Solus Recovery Fund III Master LP, Angelo, Gordon & Co., L.P.,*
*AG Super Fund International Partners, L.P.,*
*Botticelli LLC, Longhorn Credit Funding, LLC,*
*NexPoint Credit Strategies Fund, and Gov Re, Ltd.*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: | : |
| | : Chapter 11 |
| DPH HOLDINGS CORP., et al., | : |
| | : Case No. 05-44481 (RDD) |
| Reorganized Debtors. | : (Jointly Administered) |
| | : |
| SOLUS ALTERNATIVE ASSET | : |
| MANAGEMENT LP, ANGELO GORDON & | : Adversary No. 14-02445 (RDD) |
| CO, L.P., LONGHORN CREDIT FUNDING, | : |
| LLC, NEXPOINT CREDIT STRATEGIES | : |
| FUND, GOV RE, LTD., ULTRA MASTER | : |
| LTD, SOLA LTD, SOLUS OPPORTUNITIES | : **MEMORANDUM OF LAW IN** |
| FUND 1 LP, SOLUS OPPORTUNITIES FUND | : **SUPPORT OF PLAINTIFFS'** |
| 2 LP, SOLUS RECOVERY FUND III MASTER | : **MOTION, PURSUANT TO 11 U.S.C.** |
| LP, AG SUPER FUND INTERNATIONAL | : **§ 105(a) AND FED. R. CIV. P. 56(a),** |
| PARTNERS, L.P., and BOTTICELLI LLC, | : **FOR SUMMARY JUDGMENT ON** |
| | : **COUNT ONE AND COUNT TWO OF** |
| Plaintiffs, | : **FIRST AMENDED COMPLAINT** |
| | : **FOR DECLARATORY RELIEF AND** |
| vs. | : **BREACH OF CONTRACT AND FOR** |
| | : **AN ORDER DIRECTING** |
| DELPHI AUTOMOTIVE PLC and DELPHI | : **COMPANY TO COMMENCE** |
| AUTOMOTIVE LLP, | : **MAKING GENERAL UNSECURED** |
| | : **MDA DISTRIBUTION TO OLD** |
| Defendants. | : **DELPHI GENERAL UNSECURED** |
| | : **CREDITORS** |

## TABLE OF CONTENTS

PAGE

I. PRELIMINARY STATEMENT ...................................................................................1

II. FACTUAL BACKGROUND ......................................................................................5

    A. DEBTORS' BANKRUPTCY FILING AND ORIGINAL PLAN ............................................5

    B. DEBTORS' MODIFIED PLAN....................................................................................5

    C. CONFIRMATION ORDER..........................................................................................6

    D. MASTER DISPOSITION AGREEMENT .......................................................................7

    E. OPERATING AGREEMENT .......................................................................................7

    F. DISTRIBUTIONS FROM COMPANY TO ITS MEMBERS ...............................................8

        1. 2011 DISTRIBUTIONS ...................................................................................8

        2. 2012-2015 DISTRIBUTIONS ..........................................................................8

    G. REFUSAL TO MAKE GENERAL UNSECURED MDA DISTRIBUTION ...........................9

III. ARGUMENT ..........................................................................................................10

    A. PLAINTIFFS SATISFY SUMMARY JUDGMENT STANDARDS ......................................10

    B. STANDARD PRINCIPLES OF CONTRACT INTERPRETATION UNDER NEW YORK
        LAW GOVERN ANALYSIS OF PLAN PROVISIONS .....................................................11

    C. PLAIN MEANING OF MODIFIED PLAN DICTATES THAT COMPANY IS
        OBLIGATED TO COMMENCE MAKING  GENERAL UNSECURED MDA
        DISTRIBUTION.......................................................................................................12

    D. REDEMPTIONS OF GM AND PBGC EQUITY COUNT TOWARD THRESHOLD ............13

        1. REDEMPTIONS ARE "DISTRIBUTIONS TO MEMBERS" FOR PURPOSES
            OF GENERAL UNSECURED MDA DISTRIBUTION.........................................13

        2. OPERATING AGREEMENT DOES NOT ALTER COMPANY'S
            OBLIGATIONS UNDER MODIFIED PLAN.......................................................15

CONCLUSION.....................................................................................................................20

i

# TABLE OF AUTHORITIES

**Page**

## Cases

Adelphia Recovery Trust v. Bank of Am., N.A.,
390 B.R. 80 (S.D.N.Y. 2008) aff'd, 379 F. App'x 10 (2d Cir. 2010).......................................12

Celotex Corp. v. Catrett,
477 U.S. 317 (1986)...........................................................................................................11

Greenfield v. Phillies Records, Inc.,
98 N.Y.2d 562 (2002).........................................................................................................13

Hartford Accident & Indem. Co. v. Wesolowski,
33 N.Y.2d 169 (1973).........................................................................................................13

Innophos, Inc. v. Rhodia, S.A.,
38 A.D.3d 368, aff'd, 882 N.E.2d 389 (2008).........................................................................13

Interactive Motor Sports & Entertainment Cor. v. Dolphin Direct Equity Partners, LP,
419 Fed. Appx. 60 (2d Cir. 2011)..........................................................................................11

Kramer v. Time Warner Inc.,
937 F.2d 767 (2d Cir. 1991)................................................................................................11

Monex Fin. Servs. Ltd. v. Nova Information Sys., Inc.,
657 F. Supp. 2d 447 (S.D.N.Y. 2009)...................................................................................11

Silverman v. Central Equities Credit Corp., (In re 18th Ave. Realty, Inc.),
2010 WL 1849403 (Bankr. S.D.N.Y. May 7, 2010)...............................................................12

St. John's University v. Butler Rogers Baskett Architects, P.C.,
92 A.D.3d 761 (2012).........................................................................................................13

Sullivan v. Harnisch,
96 A.D.3d 667 (2012).........................................................................................................13

Tom Doherty Assocs. Inc. v. Saban Entm't Inc.,
869 F. Supp. 1130 (S.D.N.Y. 1994).....................................................................................13

United Merchants & Manufacturers, Inc.,
24 C.B.C. 220 (Bankr. S.D.N.Y. 1981).................................................................................12

In re Victory Markets, Inc.,
221 B.R. 298 (B.A.P. 2d Cir. 1998)......................................................................................12

## Statutes

26 U.S.C. § 302......................................................................................................16

26 U.S.C. § 317......................................................................................................16

Fed. R. Civ. P. 56(c) .............................................................................................11

## Other Authorities

American Heritage Dictionary of the English Language (5th ed. 2011) .......................................15

Black's Law Dictionary  (9th ed. 2009)....................................................................15

West's Law And Commercial Dictionary In Five Languages (1985) ...........................................15

Plaintiffs in the above-captioned adversary proceeding (the "Adversary Proceeding"), (a) Solus Alternative Asset Management LP ("Solus") and the following funds under its management and control:  Ultra Master Ltd, SOLA Ltd, Solus Opportunities Fund 1 LP, Solus Opportunities Fund 2 LP, and Solus Recovery Fund III Master LP (collectively, the "Solus Funds"); (b) Angelo, Gordon & Co., L.P. ("Angelo Gordon") and the following funds under its management and control:  AG Super Fund International Partners, L.P. and Botticelli LLC (collectively, the "Angelo Gordon Funds"); and (c) Longhorn Credit Funding, LLC, NexPoint Credit Strategies Fund, and Gov Re, Ltd. (collectively, the "Highland Funds," and, with Solus, the Solus Funds, Angelo Gordon, and the Angelo Gordon Funds, "Plaintiffs"), respectfully submit this memorandum of law in support of their motion (the "Motion"), pursuant to 11 U.S.C. § 105(a), Rule 56(a) of the Federal Rules of Civil Procedure, made applicable to the Adversary Proceeding pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure, and Rule 7056-1 of the Local Bankruptcy Rules for the Southern District of New York, for the entry of an Order (a) granting summary judgment with respect to the relief requested in Count One and Count Two of Plaintiffs' First Amended Complaint For Declaratory Relief And Breach Of Contract (Docket No. 20) (the "Amended Complaint") against defendants Delphi Automotive PLC ("DAP") and Delphi Automotive LLP ("DAL, and together with DAP, "Defendants" or the "Company") and (b) directing the Company to commence making the General Unsecured MDA Distribution.

## I.    PRELIMINARY STATEMENT

The Motion presents a straightforward question of contract interpretation concerning the unambiguous provisions of the First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates, Debtors And Debtors In Possession [the "Debtors" or "Old Delphi"] (As Modified) (the "Modified Plan").[1]  The outcome of this dispute has significant

---

[1]    Capitalized terms not defined herein have the meanings ascribed to them in the Modified Plan, a copy of which is attached as Exhibit A to the Transmittal Declaration Of James C. Tecce filed concurrently with the Motion (the "Transmittal Decl.").

consequences for holders of General Unsecured Claims against the Debtors ("General Unsecured Creditors") who have waited for more than a decade to receive their share of recoveries. To date, they have received nothing—while over the last several years, the Company has distributed more than $7.2 billion to those creditors that became the Company's owners (or its "members") after the chapter 11 cases. Having exceeded the $7.2 billion threshold, the Modified Plan clearly obligates the Company to commence making the General Unsecured MDA Distribution to General Unsecured Creditors. The Company obstinately refuses to honor these obligations, prompting this lawsuit.

The facts are not in dispute. Old Delphi filed for bankruptcy protection in October 2005 and in 2008 confirmed its original chapter 11 plan that proposed to pay unsecured claims in full, with interest. Old Delphi never consummated the original plan and instead filed the Modified Plan in June 2009. That plan drastically reduced distributions to General Unsecured Creditors to pennies on the dollar and provides that the General Unsecured MDA Distribution will be made as soon as the Company's members receive distributions totaling $7.2 billion.

The Company's filings with the Securities & Exchange Commission (the "SEC") confirm that through a combination of redemptions, share repurchases, and dividends, the $7.2 billion threshold has been surpassed. See Plaintiffs' Statement Of Undisputed Facts Pursuant To L.R. Bankr. P. 7056-1 In Support Of Motion (the "SOF") ¶ 15 (citing Transmittal Decl. Exhibit C-1 (relevant portions of DAP Form S-1, filed February 1, 2012 ("Form S-1")), at 10-11; Transmittal Decl. Exhibit C-2 (relevant portions of DAP Form 10-K, filed February 9, 2015 ("Form 10-K")), at 48-49, 91). The same SEC filings reveal that the Company has no intention of making the General Unsecured MDA Distribution.

The Modified Plan, however, is unambiguous and clearly requires the Company to begin making immediately the General Unsecured MDA Distribution. The phrase "distributions to its members" used in the Modified Plan means exactly what it says and applies to any type of

distribution. It is not limited to certain types of distributions selected by the Company and its members in their sole discretion.

In opposing the Motion, the Company presumably will regurgitate the same argument it made in unrelated litigation in 2012 concerning its initial public offering (the "IPO Litigation"). In the IPO Litigation, the Company argued that the members' receipt of equity in Defendant DAP in exchange for their equity in Defendant DAL through an initial public offering of DAP's stock did not count toward the $7.2 billion threshold. The Company also argued that the $4.4 billion it paid to redeem the equity in the Company previously held by General Motors Company ("GM") and the Pension Benefit Guaranty Corporation (the "PBGC") did not count toward the $7.2 billion threshold because those redemptions (allegedly) were not qualifying "Distributions" as that term is defined under the Operating Agreement. The Court did not decide the issue and instead dismissed the complaint on other grounds, specifically that the initial public offering did not count toward the threshold. (That issue has no bearing here). The Court observed, however, that a renewed complaint seeking declaratory relief might be appropriate should distributions come close to, or exceed the $7.2 billion threshold, inclusive of the GM and PBGC redemptions. See Transmittal Decl. Exhibit B (Transcript of Hearing ("Tr.") dated March 22, 2012, at 140:8-13, 141:18-24).

The Company's argument that the GM and PBGC redemptions do not count toward the threshold because they were not made on a ratable basis to all members and therefore are not "Article V" distributions under the Operating Agreement is neither persuasive nor supported by the terms of the contracts. The Modified Plan neither specifies any particular "distribution" definition, incorporates the Operating Agreement's "Distribution" definition, nor otherwise limits the type of qualifying distribution. Instead, the Modified Plan uses the clear phrase "distribution to its members." Moreover, the Order confirming the Modified Plan (the

"Confirmation Order")[2] specifically prohibits any reduction or modification of General Unsecured Creditor distributions under subsequently executed agreements, e.g., the Master Disposition Agreement, dated as of July 26, 2009 (the "MDA")[3] or the Operating Agreement.[4] Nonetheless, the threshold has been surpassed under any reading of these agreements, especially when (and to the extent the Operating Agreement is even relevant) the GM and PBGC redemptions clearly were made pursuant to Article V and not pursuant to Article XII (a consent provision).

The Company also will likely challenge Plaintiffs' standing to bring this Adversary Proceeding. But in addition to Solus and Angelo Gordon, each of whom has a pecuniary interest in the outcome of this proceeding, Plaintiffs include General Unsecured Creditors, i.e., investment funds that directly and beneficially hold General Unsecured Claims that they acquired by assignment, either directly or indirectly from other General Unsecured Creditors that held those claims as of the Claims Record Date under the Modified Plan (June 8, 2009). Plaintiffs also include investment funds that actually held General Unsecured Claims on the Claims Record Date. See Am. Compl. ¶¶ 5-13, 14-16.

The Company has run out of excuses. Flimsy standing arguments and tortured distribution definitions that find no textual support and offend the Confirmation Order cannot detract from the irrefutable conclusion that the General Unsecured MDA Distribution is presently due and owing. The Company's attempts to evade its obligations under the Modified Plan should not be countenanced. Instead, it should be directed to commence making the General Unsecured MDA Distribution immediately and at long last provide General Unsecured Creditors with their share of recoveries.

---

[2]    Transmittal Decl. Exhibit D (Confirmation Order).

[3]    Transmittal Decl. Exhibit E (MDA).

[4]    Transmittal Decl. Exhibit F (Amended And Restated Operating Agreement Of DIP Holdco 3, LLC (the "Operating Agreement")).

## II.      FACTUAL BACKGROUND

### A.      DEBTORS' BANKRUPTCY FILING AND ORIGINAL PLAN

Commencing on October 8, 2005, Old Delphi filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").  See SOF ¶ 2.  In 2007, the Debtors filed their proposed First Amended Joint Plan Of Reorganization Of Delphi Corporation And Certain Affiliates (the "Original Plan"), which provided for holders of general unsecured claims to be paid in full with accrued interest.  See SOF ¶ 3.  On January 25, 2008, the Court entered an order confirming the Original Plan.  The Debtors, however, never consummated the Original Plan.  See SOF ¶ 4.

### B.      DEBTORS' MODIFIED PLAN

On June 1, 2009, the Debtors proposed significant changes to the Original Plan designed to facilitate an exit from bankruptcy, including a proposed sale of substantially all of the Debtors' assets.  See SOF ¶ 5.  Specifically, certain of the debtor-in-possession lenders (the "DIP Lenders") formed DIP Holdco 3, LLC ("DIP Holdco 3"), predecessor-in-interest to Defendant DAL, for the purpose of acquiring Old Delphi's businesses and assets through a credit bid to be consummated pursuant to the Modified Plan and specifically pursuant to the MDA among Old Delphi, DIP Holdco 3, and GM.  See SOF ¶ 6 (citing Transmittal Decl. Ex. E (MDA)). Thereafter, DIP Holdco 3 assigned to DIP Holdco LLP its rights and obligations under the MDA. On or about October 8, 2009, DIP Holdco LLP changed its name to "Delphi Automotive LLP." See SOF ¶ 7.

The changes associated with the Modified Plan also drastically reduced the distributions to general unsecured creditors.  Initially, the proposed modifications contemplated that unsecured creditors would receive 3% of distributions to the Company's members in excess of $7.2 billion, up to an aggregate maximum distribution of $180 million.  See SOF ¶ 8.  The Creditors Committee objected to the Debtors' proposed modifications, and the classes of

unsecured creditors rejected the proposed amended plan.  Ultimately, a compromise was reached

amending the plan to increase the maximum potential distributions to unsecured creditors from

$180 million to $300 million.  The compromise was embodied in the Modified Plan.  <u>See</u> SOF ¶¶

9-10.

 In particular, section 5.3 of the Modified Plan provides for General Unsecured

Creditors—including Plaintiffs—to receive their "Pro Rata share of the proceeds of the General

Unsecured MDA Distribution."  Transmittal Decl. Ex. A (Modified Plan) at 33 (§ 5.3).  The

Modified Plan defines the General Unsecured MDA Distribution as follows:

> **1.102 "General Unsecured MDA Distribution"** means, if and to the
> extent Company Buyer makes distributions to its members in accordance
> with the Company Buyer Operating Agreement, as described in section
> 3.2.3 of Master Disposition Agreement, in excess of $7.2 billion, an
> amount equal to $32.50 for every $67.50 so distributed in excess of $7.2
> billion; <u>provided</u>, <u>however</u>, that in no event shall the General Unsecured
> MDA Distribution exceed $300,000,000 in the aggregate.

<u>Id.</u> at 14 (§ 1.102).  <u>See</u> <u>id.</u> at 8 (§ 1.36) (defining "Company Buyer" as "DIP Holco 3, LLC, on

behalf of itself and other buyers as set forth in the Master Disposition Agreement, assignees of

the rights of the DIP Agent to the Company Acquired Assets in connection with the Credit

Bid.").  Defendant DAL is successor in interest to the Company Buyer.  <u>See</u> SOF ¶ 13.

 C. CONFIRMATION ORDER

 While the Confirmation Order recognized certain plan-related agreements would be

negotiated and finalized after confirmation, it also carefully protected the interests of General

Unsecured Creditors who were not privy to those negotiations by prohibiting further

modifications to the treatment of their claims under the Modified Plan.  <u>See</u> SOF ¶ 11 (citing

Transmittal Decl. Ex. D (Confirmation Order) at 87 (¶ 64(g)) ("After the Effective Date, the

MDA Documents may be modified, amended, or supplemented by the parties thereto in

accordance with the terms thereof without further order of the Court; <u>provided</u>, <u>however</u>, that

neither prior to or after the Effective Date shall any provision in the Master Disposition

6

Agreement or Operating Agreement regarding distributions to holders of general unsecured claims of the Debtors be amended, modified, or waived to reduce, eliminate, or otherwise affect such distributions.").

### D.   MASTER DISPOSITION AGREEMENT

The MDA also confirms the Company's extant obligations to General Unsecured Creditors.  Section 3.2.3 of the MDA expressly obligates the Defendants to make any required payments to General Unsecured Creditors that are payable under the Modified Plan:

> To the extent payable following the Closing, the Company Buyer shall pay to a disbursement agent such amounts payable to the unsecured creditors of Delphi and the Filing Affiliates pursuant to the Plan of Reorganization as filed on the date of execution of this Agreement (without modification as to the consideration to be paid under this Section 3.2.3 unless consented to by Company Buyer) and the form of Company Buyer operating agreement included as an exhibit to the Securities Purchase Agreement as in effect as of the date hereof (regardless of whether such agreement is subsequently amended), for distribution to such unsecured creditors on behalf of Delphi and the Filing Affiliates, subject to the terms, conditions and limits as set forth in the Plan of Reorganization and such operating agreement, which payment to such disbursement agent shall be made only if the transactions contemplated hereby are consummated pursuant to a Plan of Reorganization and which payment shall not exceed $300,000,000 in the aggregate.

Transmittal Decl. Ex. E (MDA) at 40 (§ 3.2.3).

### E.   OPERATING AGREEMENT

The Operating Agreement was intended to set forth the governance and operating procedures of DAL.  The Operating Agreement similarly confirms DAL's obligation to make the General Unsecured MDA Distribution:

> In accordance with Section 3.2.3 of the MDA, if the Asset Purchase Agreement is consummated pursuant to the Plan of Reorganization, once an aggregate of $7,200,000,000 has been paid as Distributions to the Holders pursuant to this Agreement, the Company shall pay an amount equal to $32.5 to a disbursement agent on behalf of the unsecured creditors of Old Delphi for every $67.5 in excess of such $7,200,000,000 that is distributed to the Holders pursuant to Section 5.1(a)(iv), up to a maximum amount of $300,000,000.

Transmittal Decl. Ex. F (Operating Agreement) at 26 (§ 5.6).

Following entry of the Confirmation Order on July 30, 2009, the Modified Plan became
effective and was substantially consummated on or about October 6, 2009.  See SOF ¶ 12.

### F.   DISTRIBUTIONS FROM COMPANY TO ITS MEMBERS

As part of DAL's acquisition of Old Delphi, DAL issued membership interests to its
owners.  Those membership interests were exchanged for common stock of DAP in November
2011.  See SOF ¶ 14 (citing Transmittal Decl. Ex. C-1 (Form S-1)).

Since March 2011, the Company distributed property to its members in the form of share
redemptions, repurchases, and dividends, the aggregate amount of which exceeds the $7.2 billion
threshold.  See SOF ¶ 15 (citing Transmittal Decl. Ex. C-1 (Form S-1), Ex. C-2 (Form 10-K)).
These all constitute "distributions to its members" under the Modified Plan.

### 1.   2011 DISTRIBUTIONS

On or about March 31, 2011, DAL made a distribution of approximately $4.4 billion to
GM and PBGC on account of their membership interests.  Specifically, DAL redeemed all of the
1,750,000 Class A membership interests owned by GM and all of the 100,000 Class C
membership interests owned by the PBGC for $3.8 billion and $594 million, respectively.  See
SOF ¶ 16 (citing Transmittal Decl. Ex. C-1 (Form S-1)).

In September and October 2011, DAL repurchased 10,005 Class B membership interest
units at a cumulative cost of approximately $179 million.  See SOF ¶ 17.  DAL also made a
distribution of approximately $95 million on December 5, 2011 to its members.  See SOF ¶ 18.

### 2.   2012-2015 DISTRIBUTIONS

DAP made a number of share repurchases since 2012:  (i) a $300 million authorized
program in January 2012 that was completed in September 2012, (ii) a $750 million authorized
program in September 2012 that was completed in April 2014, and (iii) a $1.0 billion authorized
program in January 2014 of which approximately $938 million of shares had been repurchased

as of February 5, 2015, with approximately $62 million remaining.  See SOF ¶ 19 (citing

Transmittal Decl. Ex. C-2 (Form 10-K)).  Through December 31, 2014, payments made pursuant

to the Company's authorized share repurchase programs aggregate approximately $1.988 billion.

See SOF ¶ 20.

DAP also introduced an initial dividend at $0.17 per quarter in the first quarter of 2013

and subsequently raised the dividend to $0.25 per quarter in the first quarter of 2014; the

dividend has been paid quarterly since 2013.  See SOF ¶ 21 (citing Transmittal Decl. Ex. C-2

(Form 10-K) at 49).  Since its introduction in 2013, DAP has paid approximately $585 million in

dividends.  See SOF ¶ 22.  In January of 2015, DAP authorized a new share repurchase program

of up to $1.5 billion of ordinary shares to commence after the completion of the January 2014

share repurchase program.  See SOF ¶ 23.  Accordingly, as of the date hereof, the Company has

distributed property to its members that aggregates to an amount in excess of $7.2 billion.  See

SOF ¶ 24.

### G.    REFUSAL TO MAKE GENERAL UNSECURED MDA DISTRIBUTION

The Company continually takes the position in its SEC filings that it does not believe it is

likely that it will ever exceed the $7.2 billion threshold and has therefore made no reserves for

the payment of the General Unsecured MDA Distribution.  See SOF ¶ 26 (citing Transmittal

Decl. Ex. C-2 (Form 10-K)) at 91 ("Delphi considers cumulative distributions

through December 31, 2014 to be substantially below the $7.2 billion threshold ....

Accordingly, no accrual for this matter has been recorded as of December 31, 2014.").

As of the date hereof, the Company has not commenced making the General Unsecured

MDA Distribution.  See SOF ¶ 25 (citing Reorganized Debtors' Case Closing Status Report, at

¶ 11, filed Dec. 13, 2013 (Docket No. 22245 in Chapter 11 Case No. 05-44481 (RDD) Bankr.

S.D.N.Y.) ("As of the date hereof [12/13/13], New Delphi has not made any distributions [to

General Unsecured Creditors]"); Reorganized Debtors' Motion For Final Decree And Order

9

Pursuant To 11 U.S.C. §§ 105, 350(a), And 1142, Fed. R. Bankr. P. 3022, And Local Bankr. R.

3022-1 Closing Bankruptcy Cases And Providing Related Relief, dated July 7, 2013 (Docket No.

22073 in Chapter 11 Case No. 05-44481 (RDD) Bankr. S.D.N.Y.) at 4 (defining "New Delphi"

as DAP)).

### III.    ARGUMENT

#### A.    PLAINTIFFS SATISFY SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 320 (1986) (citing then-applicable Fed.

R. Civ. P. 56(c)).

In considering a motion for summary judgment, courts may take judicial notice of the

contents of filings with the SEC. Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir.

1991) (district court may "take judicial notice of the contents of relevant public

disclosure documents required to be filed with the SEC as facts 'capable of accurate and ready

determination by resort to sources whose accuracy cannot reasonably be questioned'") (quoting

Fed. R. Evid. 201(b)(2)).

Summary judgment is particularly justified when, as is the case here, the Motion presents

purely legal questions related to contract interpretation. Interactive Motor Sports &

Entertainment Cor. V. Dolphin Direct Equity Partners, LP, 419 Fed. Appx. 60, 61-62 (2d Cir.

2011) ("Interpretation of the terms of a legally binding agreement, such as a contract, are

questions of law and therefore appropriate for summary judgment"); see also Monex Fin. Servs.

Ltd. v. Nova Information Sys., Inc., 657 F. Supp. 2d 447 (S.D.N.Y. 2009) (stating that when

determination of issues depends upon construction of a written instrument and legal effect to be

drawn therefrom, question at issue is essentially one of law only determinable by

summary judgment).

The facts relevant to this dispute are uncontroverted.  The Motion presents a pure

question of law regarding the interpretation of the unambiguous Modified Plan, MDA and

Operating Agreement.  Accordingly, the Court can award summary judgment to Plaintiffs.

### B.    STANDARD PRINCIPLES OF CONTRACT INTERPRETATION UNDER NEW YORK LAW GOVERN ANALYSIS OF PLAN PROVISIONS

A chapter 11 plan of reorganization is an enforceable contract that is construed in

accordance with applicable state law principles of contract interpretation.  Adelphia Recovery

Trust v. Bank of Am., N.A., 390 B.R. 80, 89 (S.D.N.Y. 2008) aff'd, 379 F. App'x 10 (2d Cir.

2010) ("[A] confirmed plan of reorganization is a contract to be interpreted by the court…and []

[is] appropriate for consideration according to principles of contract law."); In re Victory

Markets, Inc., 221 B.R. 298, 303 (B.A.P. 2d Cir. 1998) ("[A] confirmed plan holds the status of a

binding contract as between the debtor and its creditors ... As with any contract, the starting point

for review of a plan is its plain language.") (internal citations omitted); United Merchants &

Manufacturers, Inc., 24 C.B.C. 220, 226–27 (Bankr. S.D.N.Y. 1981) (providing that "a plan is a

kind of contract ... [and] disputed provisions should be interpreted in light of general contract

principles."); Silverman v. Central Equities Credit Corp., (In re 18th Ave. Realty, Inc.), 2010 WL

1849403, at *5 (Bankr. S.D.N.Y. May 7, 2010) ("In construing a chapter 11 plan ... the Court

should apply contract principles.").

The Modified Plan provides that the laws of the State of New York govern its

interpretation.  See Transmittal Decl. Ex. A (Modified Plan) at 72 (§ 14.10) ("Unless a rule of

law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy

Rules) or unless otherwise specifically stated, the laws of the State of New York shall govern the

construction and implementation of this Plan, any agreements, documents, and instruments

executed in connection with this Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreements shall control.").

Under New York state law, a "written agreement which is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Sullivan v. Harnisch, 96 A.D.3d 667, 667 (2012). See also St. John's University v. Butler Rogers Baskett Architects, P.C., 92 A.D.3d 761, 765 (2012) ("Contract language which is clear and unambiguous must be enforced according to its terms.").

The "ultimate objective in interpreting a written contract is to determine 'the intention of the parties as derived from the language employed.'" Tom Doherty Assocs. Inc. v. Saban Entm't Inc., 869 F. Supp. 1130, 1137 (S.D.N.Y. 1994) (quoting Hartford Accident & Indem. Co. v. Wesolowski, 33 N.Y.2d 169, 171 (1973)). See also Greenfield v. Phillies Records, Inc., 98 N.Y.2d 562, 569 (2002) ("The fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent ... and '[t]he best evidence of what parties to a written agreement intend is what they say in their writing.'") (citations omitted).

### C.    PLAIN MEANING OF MODIFIED PLAN DICTATES THAT COMPANY IS OBLIGATED TO COMMENCE MAKING GENERAL UNSECURED MDA DISTRIBUTION

The provisions of the Modified Plan, the MDA and the Operating Agreement are clear and unambiguous.  Accordingly, none of these agreements should "be unnaturally forced beyond their ordinary meaning." Innophos, Inc. v. Rhodia, S.A., 38 A.D.3d 368, 374, aff'd, 882 N.E.2d 389 (2008).

Each agreement expressly obligates Defendants to make distributions up to $300,000,000 to holders of General Unsecured Claims against the Debtors once the Company's distributions to its members exceed $7.2 billion.  Section 5.3 of the Modified Plan provides for holders of General Unsecured Claims against the Debtors to receive their "Pro Rata share of the proceeds of the General Unsecured MDA Distribution." See Transmittal Decl. Ex. A (Modified Plan) at 33

(§ 5.3). The Modified Plan defines the General Unsecured MDA Distribution to mean "if and to the extent Company Buyer makes distributions to its members in accordance with the Company Buyer Operating Agreement, as described in section 3.2.3 of Master Disposition Agreement, in excess of $7.2 billion, an amount equal to $32.50 for every $67.50 so distributed in excess of $7.2 billion; provided, however, that in no event shall the General Unsecured MDA Distribution exceed $300,000,000 in the aggregate." Id. at 14 (§ 1.102); see also Transmittal Decl. Ex. E (MDA) at 40 (§ 3.2.3); Transmittal Decl. Ex. F (Operating Agreement) at 26 (§ 5.6).

The Modified Plan requires the Company to make the General Unsecured MDA Distribution once it makes "distributions to its members" in excess of the threshold. The Company's SEC filings make clear this threshold has been met. See Transmittal Decl. Ex. C-1 (Form S-1), C-2 (Form 10-K). Accordingly, the Company must immediately begin paying the General Unsecured MDA Distribution to the General Unsecured Creditors.

### D. REDEMPTIONS OF GM AND PBGC EQUITY COUNT TOWARD THRESHOLD

Defendants will likely argue the redemptions of the equity held by GM and the PBGC do not count as "distributions to its members" for purposes of the Modified Plan because they purportedly were not made as ratable distributions under Article V of the Operating Agreement. Defendants are wrong.

### 1. REDEMPTIONS ARE "DISTRIBUTIONS TO ITS MEMBERS" FOR PURPOSES OF GENERAL UNSECURED MDA DISTRIBUTION

The Modified Plan uses the word "distributions" in its broadest sense rather than creating a cramped definition that would restrict the type of distributions that qualify for the $7.2 billion threshold. Although it easily could have been accomplished, nothing in the Modified Plan, the Confirmation Order, the MDA or the Operating Agreement limits what qualifies as a distribution or incorporates the Defendants' flawed interpretation of the Operating Agreement's definition of "Distribution" into the Modified Plan.

The plain meaning and common usage of the term "distributions" confirm that the
redemptions of GM's and the PBGC's equity interests constitute "distributions" to DAL
members.  In redeeming the equity of GM and the PBGC, the Company was dispensing its
property in portions to its members.  See American Heritage Dictionary of the English Language
(5th ed. 2011) (defining "distribute" as "to divide and dispense in portions"); Black's Law
Dictionary  (9th ed. 2009) (defining a distribution as "the act or process of apportioning or giving
out"); West's Law And Commercial Dictionary In Five Languages (1985) (defining
"Distribution" to mean "[t]he giving out or division among a number, sharing or parceling out,
allotting, dispensing, apportioning.").

By analogy, the Internal Revenue Code confirms the common understanding of the word
"distribution" and the extent to which the Company's redemption of its members' equity
conforms to that understanding.  The Internal Revenue Code considers a redemption to be a
"distribution" of the corporation's property to the extent the redemption is either (1) not
essentially equivalent to a dividend, (2) substantially disproportionate with respect to the
shareholder or, (3) as is the case here, a complete redemption of all of the stock of the
corporation held by the shareholder.  See 26 U.S.C. § 302(a) ("If a corporation redeems its stock
(within the meaning of section 317(b)), and if paragraph (1), (2), (3), (4), or (5) of subsection (b)
applies, such redemption shall be treated as a distribution in part or full payment in exchange for
the stock."); § 302(b)(1) ("Redemptions not equivalent to dividends"); (2) ("Substantially
disproportionate redemption of stock"); (3) ("Termination of shareholder's interest");
(4) ("Redemption for non-corporate shareholder in partial liquidation"); and (5) ("Redemptions
by certain regulated investment companies"); § 302(d) (stating "if subsection (a) of this section
does not apply, such redemption shall be treated as a distribution of property to which section
301 applies"); § 317(b) ("[S]tock shall be treated as redeemed by a corporation if the corporation

14

acquires its stock from a shareholder in exchange for property, whether or not the stock so

acquired is cancelled, retired or held as treasury stock.").

> **2.    OPERATING AGREEMENT DOES NOT ALTER COMPANY'S OBLIGATIONS
> UNDER MODIFIED PLAN**

Hard pressed to argue the redemptions of GM's and the PBGC's equity are not

"distributions to its members" for purposes of the Modified Plan, Defendants will likely rehash

their argument that (a) "distributions to its members" under the Modified Plan means

"Distribution" as defined in the Operating Agreement and (b) the redemptions are not qualifying

"Distributions" under the Operating Agreement because they were not made under Article V or

Article X.  Defendants cannot exalt their faulty interpretation of the technical mechanics of the

Operating Agreement over the plain meaning of the Modified Plan.  Simply put, the Modified

Plan governs distributions to General Unsecured Creditors.

*First,*  the Operating Agreement expressly incorporates and reaffirms the Company's

obligation under the Modified Plan to make the General Unsecured MDA Distribution once the

$7.2 billion threshold has been met.  See Transmittal Decl. Ex. F (Operating Agreement) at 26 (§

5.6) ("[O]nce an aggregate of $7,200,000,000 has been paid as Distributions to the Holders

pursuant to this Agreement, the Company shall pay an amount to the Holders pursuant to Section

5.1(a)(iv), up to a maximum amount of $300,000,000.").

*Second,* the Confirmation Order makes clear that the Operating Agreement cannot affect

the General Unsecured MDA Distribution or otherwise modify the treatment afforded by the

Modified Plan to claims held by General Unsecured Creditors.  Defendants may argue the

Modified Plan's use of the phrase "in accordance with the Company Buyer's Operating

Agreement" in section 1.102 imports the Operating Agreement's defined term "Distribution"

into the Modified Plan (along with their myopic view of that definition).  Defendants' reading,

however, conflicts with the Confirmation Order's directive that nothing in the Operating

Agreement can affect distributions to General Unsecured Creditors.  See SOF ¶ 11 (citing Transmittal Decl. Ex. D (Confirmation Order) at 83 (¶ 64(g)).

Moreover, the reference to "in accordance with the Company Buyer's Operating Agreement" in section 1.102 simply means that if a "distribution to its members" was voided because it was not made in accordance with the Operating Agreement and therefore had to be returned to the Company, the distribution would not count towards the $7.2 billion threshold.  In no way does this reference to the Operating Agreement mean that the Company and its equity holders can override the Confirmation Order and unilaterally eliminate the type of distributions that count towards the threshold.

*Third,* the MDA and the Operating Agreement concern the disposition of Old Delphi's assets and Company governance, respectively.  The treatment of Old Delphi's' obligations to General Unsecured Creditors, however, is the province of, and governed by the Modified Plan. See Transmittal Decl. Ex. E (MDA) (RECITALS) ("WHEREAS … in furtherance of the Filing Affiliates' plan of reorganization, the [GM and Company Sellers] … desire to sell or cause the sale to the applicable Buyers all of their respective right, title and interest in and to the [assets] … and Buyers desire to make such purchase, subject to and in accordance with the terms and conditions set forth in this Agreement."); Transmittal Decl. Ex. F (Operating Agreement) at 1 (RECITALS) (stating "[i]n connection with the consummation currently herewith of the Asset Purchase … the parties hereto desire to amend and restate the Original Agreement to (i) admit General Motors and the Other Class B Holders as Members, (ii) to set forth the terms for the issuance of the Members Interests, and (iii) to set forth, inter alia, their understandings and agreements regarding the governance and certain operations of the Company.").

*Fourth,* Defendants cannot credibly argue that the GM and the PBGC redemptions are not "Distributions" made under Article V of the Operating Agreement and therefore do not count toward the threshold.  To the extent the Operating Agreement is even relevant to the Company's

16

obligations under the Modified Plan, the redemptions were Article V distributions.  Any argument to the contrary finds no contractual support.

Article V of the Operating Agreement is entitled "Distributions," Article X is entitled "Dissolution," and Article XII is entitled "Other Agreements."  Within Article V, different sections address different types of distributions, <u>e.g</u>, § 5.1 ("Distributions of Available Cash"), § 5.3  ("Distributions of Assets other than Cash"), § 5.4 ("Limitations on Distributions"), § 5.5 ("Tax Distributions"), and § 5.6 ("Payments Pursuant to the Master Disposition Agreement."). Article V is the only Article in the Operating Agreement addressing Distributions—with only one exception:  Article X addresses Distributions in the context of a dissolution.

According to Defendants, since the redemptions were not made ratably within a class, they do not qualify as "Distributions" made pursuant to, or in respect of, Article V.  Rather, they are redemptions made under Article XII, specifically § 12.2(b) of the Operating Agreement.  The plain text of the Operating Agreement, however, does not support that reading.

It cannot be argued that there are separate distributions under Article XII that are not captured under the definition of "Distribution."  Article XII is not a distribution provision. Rather, it is a consent provision.  It provides certain consent rights if the Company wants to repurchase membership interests on a disproportionate (<u>i.e.</u>, non <u>pro rata</u>) basis under Article V or Article X.

Specifically, Article V requires that the Company make distributions "ratably."  <u>See</u> Transmittal Decl. Ex. F (Operating Agreement) at 24 (§ 5.1(b)) ("Each Distribution to the Class A Holders under this Agreement shall be made ratably among the Class A Holders ...").  Section 12.2(b) purports to require consent for the redemption of membership interests on a disproportionate (<u>i.e.</u>, non-<u>pro rata</u>) basis.  <u>See id.</u> at 50-51 (§ 12.2(b)) ("In addition to the approval of the Board of Managers, the Company shall not take (directly or indirectly) any of the actions listed below … without the consent of the Majority Initial Class A Holders ….

17

(b) redeem, purchase, or otherwise acquire for value … any Membership Interests other than on a proportionate basis …. [F]or purposes hereof, 'proportionate' shall mean the proceeds of such event are paid to Members in the same proportions as if such amounts were distributed in accordance with Section 5.1.").

Distributions, whether ratable or non-pro rata, are not made pursuant to Article XII under the Operating Agreement.  By definition, they are made either pursuant to Article V or, in dissolution, Article X.  Article XII, and specifically section 12.2(b), speaks only to those situations when consent is required for a distribution absent an amendment of the Operating Agreement.  To that end, section 12.2(b) simply provides that the Company can make redemptions on a disproportionate (i.e., non-pro rata) basis with the consent of certain of the Company's members.  Any such distributions are still Article V distributions, albeit they are Article V distributions being made with the consent required under Article XII and section 12.2(b).

Section 12.2(b) is intended to allow the parties to consent to actions that are otherwise circumscribed under the Operating Agreement.   Once that consent is obtained, the restrictions are waived, and the action occurs "as if such amounts were distributed in accordance with Section 5.1" of the Operating Agreement.  See Transmittal Decl. Ex. F (Operating Agreement) at 51 (§ 12.2(b)).  Because there was consent to redeem GM's and PBGC's equity interests, the redemptions did not run afoul of section 12.2(b).  Thus, the redemptions of GM's and the PBGC's equity interests were made pursuant to, and in accordance with Article V of the Operating Agreement—and with any consent required by Article XII.  The redemptions fall within the "Distribution" definition of the Operating Agreement and clearly count toward the $7.2 billion threshold.

While the Operating Agreement may be amended pursuant to section 14.1, any such amendment requires consent under section 12.2(b).  See Transmittal Decl. Ex. F (Operating

Agreement) at 54 (§ 14.1 ("[T]his Agreement may only be amended, modified or waived by the Board of Managers with [inter alia] the … consents required under … Section 12.2")).  But the Company cannot amend the Operating Agreement in a way that affects distributions to General Unsecured Creditors.  Any so-called "Article XII" distribution is tantamount to an amendment to the Operating Agreement because it creates a third type of distribution beyond an Article V and Article X Distribution and therefore violates the Confirmation Order's limits on amendments to the Operating Agreement.  See Transmittal Decl. Ex. D (Confirmation Order) at 83 (¶ 64(g)); Ex. B (Transcript at 73:17-20 (Court observing "even the GM and PBGC distributions are … under Article 5 because they're either under Article 5 or there's been an amendment to the agreement"); at 74:9-11 ("Well, Article 12 requires additional consent, though, right?  So you're, in essence, amending the agreement"); at 74:14-16 ("And you're saying that the distribution went to GM and PBGC under Article 12, but that required amendment.  So then you run afoul of the order").

Ultimately, distributions do not have to occur on a pro rata basis to apply toward the $7.2 billion threshold.  The fact that certain Company members permitted disproportionate distributions to other Company members is of no moment.  A member distribution falls within section 1.102 of the Modified Plan irrespective of any agreement the members may reach among themselves with respect to the allocation of that distribution.  Accepting Defendants' argument authorizes the Company and its members in their sole discretion to avoid paying General Unsecured Creditors the General Unsecured MDA Distribution by selectively waiving pro rata distributions, contravening the protections for General Unsecured Creditors embedded in the Modified Plan and Confirmation Order.

When initially raised in the context of the IPO Litigation, the infirmities of this argument became apparent immediately.  While the Court did not rule on the issue, the argument's efficacy has not improved with time.  See Transmittal Decl. Ex. B (Tr. at 75:12-14 ("[COURT:]  [T]his

provision isn't … one that provides for a distribution."); at 77:13-17 ("[COURT:]  But why
doesn't Article 12 just—just modify the priorities here and these are available … this is available
cash, but you've modified the waterfall in [§] 5.1(a) through the consent to the redemption in [§]
12.2?"); at 78:1-5 ("[COURT:]  I don't necessarily read there being more than two distribution
sections in this agreement.  The redemption section can easily be read as just simply modifying
the order of priority that you make distributions.")).

## **CONCLUSION**

For the foregoing reasons, the Motion should be granted.

Respectfully submitted,

DATED:    New York, New York
          April 24, 2015

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By:  /s/ James C. Tecce
     _____
     Susheel Kirpalani
     James C. Tecce
     Eric M. Kay
     51 Madison Avenue, 22nd Floor
     New York, New York  10010
     Telephone:  (212) 849-7000
     Fax:  (212) 849-7100
     susheelkirpalani@quinnemanuel.com
     jamestecce@quinnemanuel.com
     erickay@quinnemanuel.com

     *Attorneys for Plaintiffs Solus Alternative Asset
     Management LP, Ultra Master Ltd, SOLA Ltd,
     Solus Opportunities Fund 1 LP, Solus Opportunities
     Fund 2 LP, Solus Recovery Fund III Master LP,
     Angelo, Gordon & Co., L.P., AG Super Fund
     International Partners, L.P., Botticelli LLC,
     Longhorn Credit Funding, LLC, NexPoint Credit
     Strategies Fund, and Gov Re, Ltd.*