UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No.: 05-44481 (RDD) |
| DPH Holdings Corp., *et al.*, | : | (Jointly Administered) |
| | : | |
| Reorganized Debtors. | : | |

------------------------------------------------------------x

| | |
|---|---|
| Solus Alternative Asset Management LP, | : |
| Angelo Gordon & Co. L.P., Longhorn Credit | : |
| Funding, LLC, Nextpoint Credit Strategies Fund, | : |
| Gov Re, Ltd, Ultra Master Ltd, Sola Ltd, | : |
| Solus Opportunities Fund 1 LP, Solus | : |
| Opportunities Fund 2 LP, Solus Recovery Fund | : |
| III Master LP, AG Super Fund International | : |
| Partners, L.P., and Botticelli LLC | : |
| | : |
| Plaintiffs, | : |
| | : |
| vs. | : Adv. Pro. No. 14-02445 (RDD) |
| | : |
| Delphi Automotive PLC and | : |
| Delphi Automotive LLP | : |
| | : |
| Defendants, and | : |
| | : |
| DPH Holdings Corp., | : |
| | : |
| Nominal Defendant. | : |

------------------------------------------------------------x

**MEMORANDUM OF DECISION ON PLAINTIFFS' AND DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Appearances:  QUINN EMANUEL URQUHART & SULLIVAN LLP, by James Tecce, Esq., for the Plaintiffs

FRIEDMAN KAPLAN SEILER & ADELMAN LLP, by Edward A. Friedman, Esq. for the Defendants

Hon. Robert D. Drain, United States Bankruptcy Judge

The plaintiffs in this adversary proceeding seek a declaration that they -- and by inference other similarly situated general unsecured creditors -- are entitled under § 5.3 of the confirmed and consummated First Amended Joint Plan of Reorganization, dated July 30, 2009 [Dkt. No. 18707] (the "Plan") of the debtors herein (the "Debtors") to the "General Unsecured MDA Distribution."  The condition triggering the right to be paid that distribution is highlighted in the definition quoted below:

> **"General Unsecured MDA Distribution"** means, *if and to the extent Company Buyer makes distributions to its members in accordance with the Company Buyer Operating Agreement, as described in section 3.2.3 of the Master Disposition Agreement, in excess of $7.2 billion*, an amount equal to $32.50 for every $67.50 so distributed in excess of $7.2 billion; provided, however, that in no event shall the General MDA Distribution exceed $300,000,000 in the aggregate.

Plan § 1.102 (emphasis added).

The parties agree that if the March 31, 2011 redemptions of General Motors Company's ("GM") Class A membership interests and PBGC's Class C membership interests (together, the "GM/PBGC Redemptions") by the successors to the "Company Buyer" which purchased the "Company Acquired Assets" of the Debtors under the Plan and the Master Disposition Agreement, dated as of July 30, 2009 (the "MDA"),[1] are to be counted toward satisfying the foregoing condition, the right to the General Unsecured MDA Distribution under Plan §§ 1.102 and 5.3 is owed in the full amount of $300 million.[2]

---

[1] A copy of the MDA is attached as Exhibit C to the Declaration of John Oster, dated April 24, 2015 [Dkt. No. 31] ("Oster Decl.").  A copy of the Plan is attached as Exhibit A to the Oster Decl.
[2] See Defendants' Statement of Material Facts Pursuant to Local Bankruptcy Rule 7056-1, dated April 24, 2015 [Dkt. No. 30] ("Def. Rule 7056-1 Statement") ¶¶ 23, 28.

The Defendants, who are the successors to the "Company Buyer,"[3] contend that the GM/PBGC Redemptions were not the kind of distributions to the Company Buyer's members contemplated by the definition of "General Unsecured MDA Distribution." Essentially, the Defendants contend that only distributions made by the Company Buyer to its members in specified percentages satisfy the condition to the general unsecured creditors' right to receive the General Unsecured MDA Distribution. Under this interpretation, because the GM/PBGC Redemptions were not made along with distributions to the Company Buyer's other members in the specified percentages, the triggering event has not occurred. Instead, they argue, the GM/PBGC Redemptions fall under a different provision of the operative documents referred to in the Plan's definition of the General Unsecured MDA Distribution.

Before the Court are the parties' respective motions for summary judgment under Fed. R. Bankr. P. 7056 pertaining to the foregoing issue.[4] Both motions are premised on the asserted plain meaning of the relevant documents; no parol evidence has been offered. After considering the relevant provisions and the parties' arguments, however, the Court concludes that consideration of such evidence is warranted and, accordingly, that both motions should be denied. This memorandum of decision states the reasons for that conclusion.

### Jurisdiction

The Court has jurisdiction over the summary judgment motions pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the broad reservation of post-confirmation jurisdiction in Art. XIII of

---

[3] Def. Rule 7056-1 Statement ¶¶ 22, 25; Plaintiffs' Statement of Undisputed Facts, Pursuant to L.R.Bankr. P. 7056-1(b), dated April 24, 2015 [Dkt. No. 27] ("P. Rule 7056-1 Statement") ¶¶ 13, 14.

[4] The Defendants also had moved to dismiss the complaint under Fed. R. Bankr. P. 7012 on the basis of the Plaintiffs' asserted lack of contractual and constitutional standing. The parties resolved that motion, however, by a Stipulation and Order Denying Defendants' Motion to Dismiss for Lack of Standing, dated July 27, 2015 [Dkt. No. 45], which provided that DPH Holdings Corp., the Debtors' successor under the Plan, would be added to this adversary proceeding as a Nominal Defendant.

the Plan and ¶ 56 of the Court's Order, dated July 30, 2009, approving confirmation of the Plan

[Dkt. No. 18707] (the "Confirmation Order").[5]  The parties' dispute arises in the Debtors'

chapter 11 cases regarding the proper interpretation and enforcement of a distribution

provision in the Plan, documents incorporated therein and the Confirmation Order; and the

Plaintiffs seek an order under 11 U.S.C. § 1142 enforcing the Plan and Confirmation Order.

Thus, for purposes of 28 U.S.C. § 1334(b) this dispute arises in a bankruptcy case and under the

Bankruptcy Code and bears a close nexus to the Plan, which reserves jurisdiction in this Court to

decide such issues.  It therefore satisfies even the narrowest test applied in the Second Circuit

for the bankruptcy courts' exercise of post-confirmation subject matter jurisdiction.  Cohen v.

CDR Creances S.A.S. (In re Euro-American Lodging Corp.), 549 Fed. App'x 52, 54 (2d Cir. 2014);

Ace Am. Ins. Co. v. DPH Holdings. Corp. (In re DPH Holdings. Corp.), 448 Fed. App'x 134, 137 (2d

Cir. 2011), cert. denied, 133 S. Ct. 51 (2012); SP Special Opportunities, LLC v. LightSquared, Inc.

(In re LightSquared, Inc.), 539 B.R. 232, 240-42 (S.D.N.Y. 2015).

### Summary Judgment Standard

Fed. R. Bankr. P. 7056 incorporates Fed. R. Civ. P. 56, which provides that the Court shall

grant summary judgment if the movant establishes that there is no genuine dispute as to any

material fact and it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The movant

bears the initial burden of satisfying the material elements of its claim or defense.  Vt. Teddy

Bear Co. v. 1-800 BEARGRAM Co., 373 F.3d 241, 244 (2d Cir. 2004).  Upon such a showing, the

nonmoving party must provide evidence of a genuine issue of material fact to defeat the

motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986).  Subject

---

[5] A copy of the Confirmation Order is attached as Exhibit B to the Oster Decl.

to exceptions not here applicable, Fed. R. Civ. P. 56(c)(1) provides that a party asserting that a

fact cannot be, or is, genuinely disputed must support the assertion by citing to particular parts

of the record or by showing that the record does not establish the absence, or presence, as the

case may be, of a genuine dispute.

Facts are material if they "might affect the outcome of the suit under the governing

law[.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The motion may not be

defeated by conclusory, self-serving or unsupported allegations, by simply raising metaphysical

doubts about a material fact, or by identifying immaterial disputed facts.  Id. at 247-48;

Matsushita Elec., 475 U.S. at 586; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000),

cert. denied, 540 U.S. 811 (2003).  Once evidence of a material disputed fact is identified,

however, the Court may not weigh the evidence or make credibility assessments but, rather,

must view it in the light most favorable to the party opposing summary judgment and draw all

reasonable inferences in favor of that party.  Amnesty Am. v. Town of W. Hartford, 361 F.3d

113, 122 (2d Cir. 2004).  "If there is any evidence in the record from any source from which a

reasonable inference in the [non-moving party's] favor may be drawn, the moving party simply

cannot obtain a summary judgment."  Binder & Binder PC v. Barnhart, 481 F.3d 141, 148 (2d

Cir. 2007) (alteration in original).

It is well recognized that "[i]f a claim or defense is predicated on a written, integrated

contract, the case may be particularly suited for resolution by summary judgment.  The

interpretation of an unambiguous contract, and the initial determination of whether the

contract is or is not ambiguous, are considered pure questions of law."  11 JAMES WM. MOORE ET

AL., MOORE'S FEDERAL PRACTICE ¶ 56.25[1][a] (3d ed. 2015); see also Am. Home. Assur. Co. v. Hapag

Lloyd Container Line, GmbH, 446 F.3d 313, 316 (2d Cir. 2006).

### Contract Interpretation

As noted, both pending motions are premised on the asserted plain meaning of the

relevant contracts, starting with Plan §§ 1.102 and 5.03 and including the agreements

referenced therein -- the MDA and the Amended and Restated Operating Agreement (the

"Operating Agreement")[6] of DIP Holdco 3, LLC (the "Company Buyer"), to which the Defendants

are successors.  Confirmed chapter 11 plans are construed as contracts under the governing

state's law (in this case the law of New York, where the Plan, the MDA and the Operating

Agreement were negotiated).[7] In re Dynegy Inc., 486 B.R. 585, 590 (Bankr. S.D.N.Y. 2013); In re

Std. Beef Co., 2011 Bankr LEXIS 2016, at *17-18 (Bankr. D. Conn. May 23, 2011); Breeden v.

Bennett (In re Bennett Funding Group, Inc.), 220 B.R. 743, 758 (Bankr. N.D.N.Y. 1997).  For

purposes of interpreting a confirmed chapter 11 plan, "all documents which were confirmed

together to form the contact are added to the plan itself."  In re WorldCom, Inc., 352 B.R. 369,

377 (Bankr. S.D.N.Y.  2006) (internal citations and quotations omitted).  Thus, the agreements

referred to in the relevant Plan provisions -- the MDA and the Operating Agreement -- are part

of the contract set forth in the Plan and need to be construed with it as a whole.  The Court-

approved disclosure statement for a chapter 11 plan also may be considered conjunctively with

the plan, at least where the disclosure statement may be relied on for purposes of claim and

---

[6] A copy of this agreement is attached as Exhibit D to the Oster Decl. (the "Operating Agreement").

[7] The Plan and the MDA also have New York choice of law provisions. Plan § 14.10; MDA § 14.5.  § 14.8 of the Operating Agreement contains a Delaware choice of law provision, but for contract interpretation purposes there is no meaningful difference between Delaware and New York law.  UBS Fin. Servs. v. W. Va. Univ. Hosps., Inc., 660 F.3d 643, 649 (2d Cir. 2011).

issue preclusion. Id.; see also Goldin Assocs., L.L.C. v. Donaldson, Lufkin & Jenrette Sec. Corp.,

2004 U.S. Dist. LEXIS 9153, at *14-17 (S.D.N.Y. May 20, 2004).

Under New York law (and federal law -- if one were to apply it instead of the law of New

York[8] -- because the relevant principles are the same):[9]

> When interpreting a contact, our primary objective is to give effect to the intent of the parties as revealed by the language of their agreement. The words and phrases in a contact should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.

> Under New York law, a contract is ambiguous if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business. No ambiguity exists where the contact language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion. When the terms of a written contact are clear and unambiguous, the intent of the parties must be found within the four corners of the contract.

Chesapeake Energy Corp. v. The Bank of New York Mellon Trust Co., N.A., 773 F.3d 110, 113-14

(2d Cir. 2015) (internal citations and quotations omitted); see also U.S. Bank Trust Nat'l Ass'n v.

AMR Corp. (In re AMR Corp.), 730 F.3d 88, 98 (2d Cir. 2013) ("When parties set down their

agreement in a clear complete document, the New York Court of Appeals has said, their writing

should as a rule be enforced according to its terms. Evidence outside the four corners of the

document as to what was really intended but unstated or misstated is generally inadmissible to

add to or vary the writing.") (internal citations and quotations omitted).

---

[8] See In re Tres Hermanos Diary, LLC, 2014 Bankr. LEXIS 198, at *19-20 (Bankr. D. N.M. Jan. 16, 2014) (noting conflicting authorities in other jurisdictions on whether state or federal common law contract interpretation principles should apply in construing a chapter 11 plan).
[9] Pig Newton, Inc. v. Bds. of Dirs. Of the Motion Picture Indus. Pension Plan, 95 F. Supp. 3d 366, 380 n.14 (S.D.N.Y. 2015) (federal law, when applied, is informed by state law principles of contract interpretation).

Thus, "[i]n a dispute over the meaning of a contract, the threshold question is whether the contract is ambiguous. . . . When an agreement is unambiguous on its face, it must be enforced according to the plain meaning of its terms." Lockheed Martin Corp. v. Retail Holdings, N.V., 639 F.3d 63, 69 (2d Cir. 2011).  The language of a contract is not made ambiguous simply because the parties urge different interpretations in the litigation, nor does ambiguity exit where one party's view strains the contract language beyond its reasonable and ordinary meaning, Law Debenture Trust Co. v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010), or where "ambiguity" emanates not from the language used in the contract but, rather, from a party's subjective perception of its terms.  Lee v. BSB Greenwich Mortg. L.P., 267 F.3d 172, 179 (2d Cir. 2001).  "If the agreement on its face is reasonably susceptible to only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity." Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569-70, 750 N.Y.S.2d 565, 570 (2002).  This is especially apt if the contract "was negotiated between sophisticated, counseled business people negotiating at arm's length." In re 785 Partners LLC, 470 B.R. 126, 132 (Bankr. S.D.N.Y. 2012) (quoting Wallace v. 600 Partners Co., 86 N.Y.2d 543, 548, 634 N.Y.S.2d 669, 671 (1995)).  In such circumstances, "courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.  Hence, courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." In re Allegiance Telecom, Inc., 356 B.R. 93, 99 (Bankr. S.D.N.Y. 2006) (quoting Vt. Teddy Bear Co. v. 538 Madison Realty Co., 1 N.Y.3d 470, 475, 775 N.Y.S.2d 765, 767 (2004)).

Nevertheless, a contract should not be construed "disregarding common sense in favor of formalistic literalism" that defies logic.  Duane Reade, Inc. v. Cartronics, 54 A.D.3d 137, 143-44, 863 N.Y.S.2d 14, 19 (N.Y. App. Div. 1st Dep't 2008) (internal quotations and citations omitted).  The Court should construe the contract "in a manner that accords the words their fair and reasonable meaning and achieves a practical interpretation of the expressions of the parties.  Put otherwise, a contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectations of the parties."  Greenwich Capital Fin. Prods., Inc. v. Negrin, 74 A.D.3d 413, 415, 903 N.Y.S.2d 346, 348 (N.Y. App. Div. 1st Dep't 2010) (internal quotations and citations omitted); see also Nat'l Union Fire Ins. Co. v. Monarch Payroll, Inc., 2016 U.S. Dist. LEXIS 19077, at *30-31 (S.D.N.Y. Feb. 17, 2016) (accord); Atlas Partners LLC v. STMicroelectronics, Int'l N.V., 2015 U.S. Dist. LEXIS 105597, at *11-12 (S.D.N.Y. Aug. 10, 2015) (accord).  In sum, under New York law a contract's "words should be given the meanings ordinarily ascribed to them and absurd results should be avoided.  The meaning of particular language . . . should be examined in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen by them to effect those purposes."  SR Int'l Bus. Ins. Co. v. Allianz Ins. Co., L.L.C., 343 Fed. App'x 629, 632 (2d Cir. 2009) (internal quotation and citation omitted); Mastrovincenzo v. City of New York, 435 F.3d 78, 104 (2d Cir. 2008) (the "cardinal principle for construction and interpretation of . . . all contracts . . . is that the intentions of the parties should control.  Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided.") (alterations in original).[10]

---

[10] See also Osborn ex rel. Osborn v. Kemp, 991 A.2d 1153, 1160 (Del. 2010) (Under Delaware law, "When the

Here, the relevant contractual provisions arguably limit the scope of the "distributions" that trigger the General Unsecured MDA Distribution as the Defendants contend.  On the other hand, the context and logic of the transaction support the Plaintiffs' interpretation.  This is the rare case, therefore, where New York's contract interpretation principles do not lead to a clear answer notwithstanding that the parties used fairly clear language to express their agreement.

## Under the Contact's Plain Terms Has the Right to the General Unsecured MDA Distribution Been Triggered?

To satisfy the condition for the General Unsecured MDA Distribution under Plan § 1.102, it is clear that the Company Buyer must have made $7.2 billion of "distributions" to its members in accordance with its Operating Agreement, as described in § 3.2.3 of the MDA.  The key phrase in Plan § 1.102 is "distributions to [Company Buyer's] members *in accordance with the Operating Agreement*," because MDA § 3.2.3 simply binds the Company Buyer to fund the General Unsecured MDA Distribution once the requisite distributions have been paid, subject to the terms of the Plan and the Operating Agreement:

> To the extent payable following the Closing, the Company Buyer shall pay to a disbursement agent such amounts payable to the unsecured creditors of [the Debtors] *pursuant to the [Plan] as filed on the date of execution of this Agreement* (without modification as to the consideration to be paid under this <u>Section 3.2.3</u> unless consented to by the Company Buyer) *and the form of Company Buyer [Operating Agreement] as in effect as of the date hereof* (regardless of whether such agreement is subsequently amended), for distribution to such unsecured creditors on behalf of [the Debtors], *subject to the terms, conditions and limits set forth in the [Plan] and such [Operating Agreement]*, which payment to such disbursement agent shall be made only if the transactions contemplated hereby are consummated pursuant to the [Plan] and which payment shall not exceed $300,000,000 in the aggregate.  Prior to the

contract is clear and unambiguous, we will give effect to the plain-meaning of the contract's terms and provisions. On the contrary, when we may reasonably ascribe multiple and difference interpretations to a contract, we will find that the contract is ambiguous.  An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract.") (footnotes removed).

> Closing Date the Official Committee of Unsecured Creditors of Delphi, and
> following the Closing Date DPH Holding Co, shall be an express third party
> beneficiary of this Section 3.2.3 and shall be entitled to directly enforce the
> provisions of this Section 3.2.3.

MDA § 3.2.3 (emphasis added). "This provision cannot be amended, modified or waived

without the written consent of such third party beneficiary." Id.[11]

The parties' dispute thus centers on the proper interpretation of the Operating

Agreement's provisions governing distributions to the Company Buyer's members.

Operating Agreement § 5.6 states,

> Payments Pursuant to the Master Disposition Agreement.  In accordance
> with Section 3.2.3 of the MDA, if the Asset Purchase is consummated pursuant
> to the Plan of Reorganization, once an aggregate of $7,200,000,000 has been
> paid *as Distributions to the Holders* pursuant to this Agreement, the [Company
> Buyer] shall pay an amount equal to $32.5 to a disbursement agent on behalf of
> the unsecured creditors of [the Debtors] for every $67.5 in excess of such
> $7,200,000,000 that is distributed to Holders pursuant to Section 5.1(a)(iv), up to
> a maximum amount of $300,000,000.

Operating Agreement § 5.6 (emphasis added).  It is thus clear that only "Distributions" to

"Holders" under the Operating Agreement can satisfy the $7.2 billion condition to the general

unsecured creditors' right to the "General Unsecured MDA Distribution" under the Plan, the

MDA and the Operating Agreement.[12]  The Operating Agreement defines "Holders" as "the

---

[11] The Confirmation Order similarly precludes any amendment of the MDA or the Operating Agreement to the detriment of the general unsecured creditors:  "[N]either prior to or after the [Plan's] Effective Date shall any provision of the [MDA] or Company Buyer Operating Agreement regarding distributions to holders of general unsecured claims of the Debtors be amended, modified, or waived to reduce, eliminate, or otherwise affect such distributions." Confirmation Order ¶ 64(g).

[12] The District Court reached the same conclusion in the context of a prior attempt to argue that the General Unsecured MDA Distribution had been triggered.  See CAI Distressed Debt Opportunity Master Fund Ltd., et al. v. Delphi Automotive PLC, et al., No. 12-CV-3968 [Dkt. No. 21], at *11-12 (S.D.N.Y. Oct. 1, 2012) (McMahon, D.J.) (a copy of which is attached as Ex. I to the Oster Decl.):  ("The [Plan] is clear: to qualify toward the $7.2 billion threshold, 'distributions' must be made by '[the Company Buyer] to its members in accordance with its Operating Agreement.' . . .  The Operating Agreement is likewise clear; it provides that only distributions 'made by [the Company Buyer] to a Member, whether in cash, property or securities of [the Company Buyer], pursuant to, or in

Class A Holders [GM], the Class B Holders [certain institutional investors listed on page 1 of the Operating Agreement], and the holders of any other Membership Interests hereinafter created by the Board of Managers in accordance with the terms of this Agreement." Id. at 1, 3 and 6.

The Operating Agreement in turn defines "Distributions" as "each distribution after the Effective Date made by the Company to a Member, whether in cash, property or securities of the Company, pursuant to, or in respect of, Article V or Article X." Id. at 4.

Article X of the Operating Agreement pertains to dissolution of the Company Buyer, id. §§ 10.1–10.8, which has not occurred; therefore, only Article V of the Operating Agreement, and, more specifically, Operating Agreement § 5.1, referenced in Operating Agreement § 5.6, applies here. It states, in relevant part:

Distributions of Available Cash

(a) [E]xcept as set forth in this Article V, all Available Cash . . . available for distribution to Members may be distributed to the extent approved by the Board of Managers, in accordance with the applicable provisions of this Article V, in the following amounts and order of priority (and, for the avoidance of doubt, the parties hereto intend that for purposes of applying the following priorities, all Distributions shall be given cumulative effect):

(i) first, simultaneously, (A) 61.40 percent to the Class A Holders and (b) 38.60 percent to the Class B Holders until the aggregate amount distributed to the Holders pursuant to clauses (A) and (B) of this subparagraph (i) equals $1,000,000,000;

(ii) second, simultaneously, (A) 72.22 percent to the Class A Holders and (B) 27.8 percent to the Class B Holders, until the aggregate amount distributed to the Holders pursuant to clauses (A) and (B) of this subparagraph (ii) equals $1,641,757,563;

(iii) third, simultaneously, (A) 26.25 percent to the Class A Holders and (B) 73.75 percent to the Class B Holders, until the aggregate amount

---

respect of, Article V' of the Operating Agreement count toward the threshold that triggers the obligation to make the General Unsecured MDA Distribution.").

> distributed to the Holders pursuant to clauses (A) and (B) of this
> subparagraph (iii) equals $1,000,000,000; and
>
> (iv)  thereafter, simultaneously, (A) 35.00 percent to the Class A Holders and
> (B) 65.00 percent to the Class B Holders.

Id. § 5.1.  Article V's exceptions to this distribution waterfall are irrelevant here, as they pertain to distributions of non-cash assets (id. § 5.3), tax distributions (id. § 5.5), and certain offsets (id. § 5.7).  "Available Cash" is defined broadly as "(i) all cash and cash equivalents on hand of the [Company Buyer] from any source, less (ii) cash and cash equivalents reasonably reserved by the [Company Buyer] or reasonably anticipated by the Board of Managers to be required to fund the [Company Buyer's] operations and other needs."  (Id. at 2.)

"Distributions" under Art. V of the Operating Agreement therefore are both broadly defined -- distributions of all cash and cash equivalents on hand from any source less reasonable reserves -- and, arguably, narrowly defined as only those that may be made in the percentages prescribed by Operating Agreement § 5.1.  The Plaintiffs take the former view, and clearly the dictionary definition of a corporate distribution encompasses redemption payments such as the GM/PBGC Redemptions.  See Black's Law Dictionary (10th ed. 2014):

> **Corporate distribution.** (1925) A corporation's direct or indirect transfer of money or other property, or incurring of indebtedness to or for the benefit of its shareholders, such as a dividend payment out of current or past earnings.

> **Redemption.**  3. *Securities*.  The reacquisition of a security by the issuer. Redemption usu. refers to the repurchase of a bond before maturity, but it may also refer to the repurchase of stock and mutual fund shares.[13]

---

[13] See also Chesapeake Energy Corp v. Bank of New York, 773 F.3d 110, 116 (2d Cir. 2014) ("'Redeem (in the verb form) or 'redemption' (in its noun form) refers to '[t]he reacquisition of a security by the issuer.'") (alteration in original).

The Defendants clearly are correct, however, that "Distributions" under the Operating Agreement are something less than the broad dictionary definition of "distribution."  As discussed above, for purposes of this dispute, under the Operating Agreement's definition of the term, Distributions are only "each distribution . . . made by the [Company Buyer] to a Member . . . pursuant to, or in respect of, <u>Article V</u>." (Operating Agreement at 4.)  Thus, if Article V of the Operating Agreement limited permissible Distributions to those made only from Available Cash, for example, the Operating Agreement's definition of "Distribution" would be narrower than the <u>Black's Law Dictionary</u> definition, quoted above, which includes the incurrence of indebtedness for the benefit of a shareholder.  The Defendants contend that the Operating Agreement's definition of "Distribution" is, in fact, narrowed by Operating Agreement § 5.1 to include only those distributions that comply with that section's waterfall percentages, and thus would exclude the GM/PBGC Redemptions, which were not made simultaneously with any distributions to the Company Buyer's other Members/Holders, let alone distributions in the percentages specified in § 5.1.  Because Article V of the Operating Agreement does not specify any other relevant way that Available Cash can be distributed to Members/Holders, the Defendants argue, the GM/PBGC Redemptions could not have been "paid as Distributions to the Holders" as contemplated by Operating Agreement § 5.6.

In response, one might ask how the GM/PBGC Redemptions were permitted, since they were made from Available Cash?  The answer complicates both sides' positions.  Operating Agreement § 12.2 states that only with the approval of the Board of Managers and the consent of the Majority Initial Class A Holders [GM] may the Company Buyer:

(b)  for so long as the Initial Class A Holders own at least ten percent (10%) of the Class A Membership Interests originally acquired by [GM] on the Effective Date,

redeem, purchase or otherwise acquire for value . . . any Membership interests other than on a proportionate basis (except to repurchase Membership Interests owned by former employees of the [Company Buyer] or any of its Subsidiaries (for purposes hereof, 'proportionate' shall mean the proceeds of such event are paid to Members in the same proportions as if such amounts were distributed in accordance with Section 5.1).[14]

Thus, the parties provided in § 12.2(b) that, with the Board of Manager's approval and the consent of GM, the Company Buyer could redeem Members/Holders' interests without adhering to the waterfall percentages in Operating Agreement § 5.1. The Defendants contend that in drafting the Operating Agreement in this manner, the parties authorized a type of distribution -- a permissible redemption -- that was not an Article V "Distribution." Why else, they argue, would § 12.2(b) state that, without such consent, redemptions must be made "as if" distributed in accordance with § 5.1, rather than simply "under" § 5.1? Clearly, they contend, redemptions, though falling within the generally accepted definition of "distributions," are not "Distributions" for purposes of the Operating Agreement because they are dealt with and authorized by (at least for the non-proportionate GM/PBGC Redemptions) a different section of the Agreement, outside of Article V, namely § 12.2(b). Moreover, they point out, at least one other provision of the Operating Agreement seems to contemplate distributions to Members on account of their membership interests that are not "Distributions" -- the agreement's definition of "Unreturned Original Cost," which states,

"Unreturned Original Cost" means, with respect to the Class A Membership Interests, the amount (which shall be not less than zero) equal to (i) $1.75 billion, minus (ii) the aggregate Fair Market Value of the Distributions and any *other* cash or non-cash payments made to the holder of such Class A Membership

---

[14] This section is in addition to, or separate and apart from, Operating Agreement § 14.1, which conditions any amendments of the Operating Agreement "except as otherwise expressly provided herein" on the consent of not only the Board of Managers but also the *Majority* Class A Holders *and* the Majority Class B Holders.

Interests (including such holder's predecessors in interest) in respect of such
Class A Membership Interests.

Operating Agreement at 12 (emphasis added).[15]

The Plaintiffs argue, on the other hand, that there simply is no separate category of distributions to Members that is not a "Distribution."  To them, Operating Agreement § 12.2(b) simply provides for another way to distribute Available Cash "in accordance with the applicable provisions of Article V,"[16] which can always be varied, they say, with authorized consent from how Available Cash "may" be distributed in § 5.1[17] or "in respect of Article V".[18]  In other words, the Plaintiffs contend, an authorized non-proportional redemption under Operating Agreement § 12.2(b) "respects" Article V by acknowledging that it is exempt from Article V's waterfall percentages.  This authorized consent apparently is what happened with respect to the GM/PBGC Redemptions.[19]  The Operating Agreement's references to cash payments to Members in respect of their interests other than Distributions, they contend, are mere

---

[15] See also Operating Agreement § 7.9 (referring to setting record dates for voting purposes for Members "entitled to receive a Distribution or a payment of any kind.").

[16] Id. § 5.1.

[17] Id.

[18] Id. at 4 (definition of "Distribution").

[19] Alternatively, the Plaintiffs contend, the consents required for the GM/PBGC Redemptions constituted an amendment, modification or waiver of an applicable provision of the Operating Agreement (§ 5.1) that reduced, eliminated or otherwise affected the general unsecured creditors' distribution right under the Plan in derogation of ¶ 64(g) of the Confirmation Order and MDA § 3.2.3.  However, the consent right under Operating Agreement § 12.2(b) separately exists; to exercise it does not amend, modify or waive any provision of the Operating Agreement, unlike an amendment of that agreement under § 14.1.  There is, in addition, some dispute between the parties about the origin of the PBGC's membership interests in the Company Buyer and whether the issuance or redemption of those interests constituted an amendment of the Operating Agreement, but it appears clear that (a) they derive from a Waiver and Release Agreement between GM and the PBGC, dated as of July 21, 2009 and (b) did not dilute the Class B Members' interests in the Company Buyer as they came from the interests originally allocated to GM.  Waiver and Release Agreement §§ 1-2.  The Waiver and Release Agreement is attached as Exhibit 7.17 to the Plan and made a part thereof.  (Dkt. No. 18559.)  Thus, the redemption of the PBGC's interests appears to have been authorized under Operating Agreement § 12.2(b) and did not require an amendment to the Operating Agreement.

surplusage, inspired by the same warped propensity that leads lawyers to add the phrase "but limited to" after "including".[20]

If you are starting to feel like a somewhat queasy witness to a debate between 13th Century scholastic theologians, you are not alone.  Taking all of these points into account, however, the Defendants have somewhat the better of the "plain meaning" argument.  The GM/PBGC Redemptions, dependent on Operating Agreement §2.2(b), do not derive from and are not directly linked to Article V of the Operating Agreement or § 5.1's waterfall provision, whereas the Operating Agreement's definition of "Distribution" is directly tied to Article V.  Ordinarily, this would carry the day, with the exception of a critical countervailing consideration:  the Defendants' construction does not make economic sense.  In other words, excluding the GM/PBGC Redemptions from the definition of "Distributions" that would trigger the General Unsecured MDA Distribution would very arguably lead to an absurd result in light of the context and purpose Plan § 5.3, as explained below.

These chapter 11 cases provide textbook examples of operational success that increased the Debtors' value stymied by broader market forces which drastically reduced the Debtors' value, followed, eventually, by a return of general market health that led to a resurgence in the Debtors' value.  These dramatic fluctuations of the Debtors' enterprise value, detailed (except for the last) in the supplement to the disclosure statement for the Plan, initially gave the Debtors' unsecured creditors hope for a full recovery but ultimately caught them in the valuation trough.  The Plan was confirmed in that trough because the Debtors' cash position did

---

[20] The Defendants respond, properly, with canons of contract interpretation such as the rule against contract readings that render provisions superfluous and *expressio unius est exclusio alterius*, although, as with all such maxims, these are only non-dispositive aids to interpretation and should not be used to exclude too readily, as if ignoring guests at a party, the legitimate possible meaning of an agreement.

not permit the luxury of waiting for a market rebound.  It appears, however, that Plan § 5.3

reflects the unsecured creditors' attempt to maintain some recovery notwithstanding being

"out of the money" when the Plan was confirmed, based on the premise (not unreasonable, as

it turned out), that the Debtors' fortunes would revive with the market's eventual recovery.

Having filed for chapter 11 relief in October, 2005, by the Fall of 2007 the Debtors had

used the Bankruptcy Code to achieve a fundamental operational restructuring, which also

included consensual modifications of their collective bargaining agreements and pension plans

and a reconstituted relationship with their largest creditor and main customer, GM.

Accordingly on January, 25, 2008, the Court confirmed a chapter 11 plan for the Debtors

premised on an agreed $12.8 billion enterprise value, which was supported by substantial

investment and loan commitments by third parties comprising a $1.75 billion rights offering, a

$2.55 billion investment commitment, and emergence capital and revolver commitments of

$4.7 billion and $1.4 billion.  Def. Rule 7056-1 Statement ¶¶ 11-13; Supplement to First

Amended Disclosure Statement, dated June 1, 2009 [Dkt. No. 16646] ("Discl. Suppl.") at S-iv, S-

ix-S-xi.  Under this plan, general unsecured creditors were projected to recover all of their

allowed claims plus accrued postpetition interest in the form of new common stock and the

additional right to participate in a discounted rights offering.  Discl. Supp. at S-xi.

Although Lehman Brothers' filing for relief under chapter 11 of the Bankruptcy Code on

September 15, 2008 often is said to be the seminal event of the global financial crisis of 2008-

2009, capital markets had significantly contracted by the Spring of 2008, and, the Debtors' third

party investors terminated their agreement on April 4, 2008 before the funding for Delphi's

confirmed plan closed.  Discl. Suppl. at S-iv.  Thereafter, the Debtors scrambled to find other

ways to fund their emergence from chapter 11.  Id. at S-v.

In addition to grappling with an ever worsening national financial crisis, moreover, the

Debtors faced an unprecedented decline in the auto industry sector that eventually led to the

chapter 11 filings of Chrysler and GM.  Id. at S-v-S-vii.  Now with no readily available sources of

ongoing funding, let alone funding for their emergence from chapter 11, the Debtors therefore

required three extension and forbearance agreements on their debtor-in-possession loan ("DIP

Loan"), the last of which was set to expire when the Debtors proposed a new chapter 11 plan in

June 2009 that was premised on a far different third party investment than their previously

confirmed but unconsummatable chapter 11 plan.  Id. at S-vii, S-12-S-14.  Under this proposed

modified plan, GM, with TARP funds from the United States Government, would purchase the

Debtor's steering business and certain plants that manufactured primarily GM parts, and a third

party, Platinum Equity Capital Partners II, L.P. ("Platinum"), would buy an interest in

substantially all of the Debtors' remaining assets and provide post-consummation funding to

the buyer entity, Parnassus Holdings II, LLC ("Parnassus").  Id. at S-14-S-15.  The amount of

these commitments was insufficient, however, to enable the Debtors to emerge from chapter

11 unless a substantial portion of the DIP Loan was left unpaid on the proposed plan's effective

date.  Thus, as required by 11 U.S.C. § 1129(a)(9)(A), the proposed modified plan could not be

confirmed without the DIP lenders' consent, for which the DIP lenders were offered an interest

in Parnassus.  Id. at S-40.  Under the proposed plan, GM also would receive an interest in

Parnassus in return for certain additional funding and other concessions.  Id. at S-15.

Under the proposed modified plan, Delphi's general unsecured creditors faced an even greater reversal of fortune than the DIP lenders (whose claims, of course, were senior to the general unsecured creditors'): they would receive a contingent right to be paid just 3% of distributions by the Parnassus acquisition vehicle to its members in excess of $7.2 billion, not to exceed $180 million. Id. at S-xxii-S-xxiv; proposed First Amended Plan of Reorganization, dated June 1, 2009 [Dkt. No. 16646] § 1.95. The Official Committee of Unsecured Creditors responded by objecting to the Debtor's motion to modify the confirmed plan. Def. Rule 7056-1 Statement ¶ 15. Ultimately, however, the Committee's objection was consensually resolved. The resulting Plan retained the basic concept of the prior proposed plan modification's treatment of general unsecured creditors: they would receive the right to a contingent payment after distributions to the Company Buyer's[21] members in excess of $7.2 billion. However, the ratio for the general unsecured creditors' distribution increased from $3 for every $100 distributed to the acquisition vehicle's members to $32.50 for every $67.50 distributed to such members above $7.2 billion, and the maximum of amount of distributions to general unsecured creditors increased from $180 million to $300 million. Plan § 1.102.

Unlike the originally confirmed plan, the Plan was not premised on a total enterprise valuation of the Debtors. One can reasonably infer, though, from (a) the contingent nature of the unsecured creditors' distribution right, (b) the consideration provided by GM and the DIP lenders, and (c) the fact that no one was prepared to submit a higher and better offer for the

---

[21] The Plan was also modified to eliminate Platinum and Parnassus' role -- the members in the Company Buyer (no longer Parnassus) would be the DIP lenders (through DIP Holdco 3, LLC, the predecessor to the Defendants) in return for their agreement to convert a larger portion of the DIP loan into Company Buyer membership interests, as well as GM. MDA at 1-2; Operating Agreement at 1, 3.

Debtors' assets, that the imputed value of the assets purchased by the Company Buyer had materially decreased in light of the general market turmoil and that the general unsecured creditors were very likely "out of the money." Thus, foregoing the right to a fixed distribution on or around the Plan's effective date, the Official Committee of Unsecured Creditors was able to bargain only for a contingent distribution if recoveries by senior creditors -- the DIP lenders and GM, now as the members of the Company Buyer -- ever exceeded $7.2 billion.

Such treatment -- colloquially known in financial and restructuring circles as "schmuck insurance" -- is a fairly common way, similar to warrants or contingent value rights, to resolve a plan objection by junior creditors who, under the facts prevailing at plan confirmation, have little chance to establish a valuation that would entitle them to a fixed distribution but who have some "hold up" leverage based on their ability to contest confirmation. The senior creditors (whose recovery also is contingent on the performance of the acquired or reorganized debtor because they are being paid in stock, not cash) are willing to provide the contingent right to the junior creditors because its trigger occurs only if the senior creditors have already received a handsome return for their risk, while the junior creditors do not look like idiots for failing to predict an eventual material increase in the debtor's value. In other words: If S receive $\geq \$y$, then J receive $\$z$, where S are the senior creditors, y is a "home run" recovery on their investment, and J are the junior creditors. One can reasonably infer that the General Unsecured MDA Distribution under §§ 1.102 and 5.3 of the Plan was written in this context, as it follows this construct.

Given that context, or underlying purpose, it is very hard to make any sense of the Defendants' construction of the relevant contractual provisions that would result in a payout to

the general unsecured creditors if GM and the PBGC receive distributions proportionately with

the DIP lenders according to a waterfall formula but not if they receive them non-

proportionately.  As far as the general unsecured creditors are concerned, the same enterprise

value supports both types of distributions.  Distributions to GM and the PBGC in one context --

Operating Agreement § 5.1 -- clearly are to be counted toward the $7.2 billion trigger under

Plan § 5.3 and MDA § 3.2.3; it is not as if the parties carved out distributions generally to GM

and the PBGC from the $7.2 billion trigger for some business reason.  Why, then, would they be

carved out if made non-proportionally under Operating Agreement § 12.2(b), in essence adding

billions of dollars to the $7.2 billion trigger?  No plausible answer comes to mind.

This, therefore is not a case where the Court desires a particular result that it thinks is

"fair."  Rather, the Defendants' construction of the agreement leads to a result that is very

likely absurd, or contrary to the business purposes underlying the agreement.  Lipper Hldgs, LLC

v. Trident Hldgs, LLC, 1 A.D.3d 170, 171, 766 N.Y.S. 2d 561, 562 (N.Y. App. Div. 1st Dep't 2003)

("A contract should not be interpreted to produce a result that is absurd, commercially

unreasonable, or contrary to the reasonable expectations of the parties.") (internal citations

omitted); Samba Enters., LLC v. iMesh, Inc., 2009 U.S. Dist. LEXIS 23393, at *11-12, *14-16,

(S.D.N.Y. Mar. 19, 2009) aff'd 390 Fed. App'x 55 (2d Cir. 2005).

One might ask, then, why not grant the Plaintiffs' motion for summary judgment?  The

answer is that Plaintiffs' highly plausible construction of the parties' agreement is belied by the

Defendants' superior construction of the agreement's terms.  Given the constraints on granting

summary judgment if any evidence of a countervailing material fact is identified (here, the

conflicting facts of the agreement's plain terms and evident purpose), I conclude that the

proper course would be to develop a factual record, using parol evidence, regarding whether the parties intended to distinguish consensual redemptions of the GM and PBGC membership interests in the Company Buyer from other, proportional distributions to all the Company Buyer's members.

Accordingly, both motions for summary judgment are denied.  The parties should jointly submit an order denying both motions; if they cannot agree on its terms, each should submit an order granting its objection to the other's motion.  The parties also should promptly schedule a pre-trial conference to discuss discovery in this adversary proceeding.

Dated:  White Plains, New York
       May 13, 2016

                     /s/ Robert D. Drain            
                     United States Bankruptcy Judge